### Petition of CLYDE S. S. CO.

(District Court, S. D. New York. July 26, 1926.)

1. **Seamen ⚖️29(2)—Permitting loose powder on deck at time cargo was being discharged held negligent.**

   Permitting powder to remain on deck, with knowledge that loose powder was running out of container at time cargo was being discharged in immediate vicinity, held to constitute negligence as respected liability for officer's death from explosion.

2. **Seamen ⚖️29(5)—Seaman's death held to have resulted from explosion of powder when employee dropped lighted match thereon.**

   Seaman's death held to have resulted from explosion of powder on ship's deck, when employee engaged in unloading cargo threw lighted match thereon.

3. **Seamen ⚖️29(4)—Ship employee held not guilty of contributory negligence in explosion of powder leaking from cases of which he had no knowledge.**

   Ship employee, having no knowledge that powder on ship's deck had leaked from cases, held not guilty of contributory negligence as to explosion therefrom resulting in his death.

4. **Admiralty ⚖️21—Right of recovery for seaman's death as result of explosion on ship is not affected because actual death was in hospital (Merchant Marine Act, June 5, 1920, § 33 [Comp. St. § 8337a]).**

   Recovery for death of seaman, resulting from explosion of powder on ship at time cargo was being discharged, may be had under Merchant Marine Act June 5, 1920, § 33 (Comp. St. § 8337a), although death actually resulted in hospital to which he was removed.

5. **Death ⚖️95(1)—$25,000 allowed for death of 32 year old seaman holding master's license.**

   $25,000 will be allowed for death of seaman 32 years of age, holding a master's license, and earning salary of approximately $132 per month.

In Admiralty. Petition by the Clyde Steamship Company for limitation of liability as to the claim of Elizabeth Beer, as administratrix of the goods, chattels, and credits of Adolph Beer, deceased. Judgment for claimant.

Haight, Smith, Griffin & Deming, of New York City, for petitioner.

David M. Fink, of New York City, for claimant.

KNOX, District Judge. On August 22, 1922, the American steamer Inca lay at a dock in San Pedro de Macoris, Dominican Republic, where her cargo was being discharged by a number of native longshoremen, employed by the ship. One of the party was a diver by the name of Wah Wah. Adolph Beer was first officer of the vessel.

Somewhere near 10 o'clock in the morning, fire was discovered in the starboard compartment of the forepeak. In that compartment, or in the one immediately adjoining to port, a number of cases of gunpowder were stored. The fire did not become serious, and was shortly put out by the use of a hose and extinguisher in the hands of Beer. But, as a precautionary measure, it was considered advisable to remove the explosives to a place of safety. The work was undertaken by the steward, and several others of the ship's company. One witness says that Beer took part in the removal, and Hord, the second officer, says that he and the captain gave assistance. At all events, a number of the crew passed the powder, which was in cans packed in boxes, from one to the other until it was piled on the port side of the Inca, alongside No. 2 hatch.

On the trial before me, Hord testified that, as the boxes were being stacked on the deck, he noticed powder trickling from one of the cases, and that he called the captain's attention to the fact. He further testified that the master instructed Beer to cover the powder with a tarpaulin and watch it.

At about this time, Wah Wah had dived for a piece of cargo that had fallen into the water. Having recovered it, he returned aboard the ship and walked up along the deck and stood near by the powder. Then, according to Hord, the native struck a match, presumably to light a cigarette, and dropped it to the deck. This act was followed by a terrific explosion that not only injured some of the vessel's crew, but killed outright three members of the vessel's discharging gang. Beer was so badly hurt that he was taken to a hospital in San Pedro de Macoris. On the evening of the day of the explosion, his injuries proved fatal.

Thereafter the wife of Beer qualified as his administratrix, and instituted suit for damages against Clyde Steamship Company, owner of the Inca, in the Supreme Court of the state of New York. Various acts of negligence were alleged against the defendant, which were denied. The action went to trial, and resulted in a verdict for plaintiff. Due to an error of the trial court, its judgment was set aside and a new trial ordered.

As soon as this was done, Clyde Steam-ship Company instituted limitation of liability proceedings in this court. The administratrix then came here to assert her claim, alleging that petitioner (1) failed to maintain the vessel in a reasonably safe and seaworthy condition; (2) failed to properly warn the crew of the presence of an explosive substance such as gunpowder; (3) failed to take sufficient, proper, and customary precautions to safeguard the members of the crew.

So far as the facts are concerned, the defense to the claim is based upon the contention that Hord did not see the loose powder, and particularly that he did not see Wah Wah drop the match that I am asked to find gave rise to the explosion.

Prior to the outbreak of the fire, Hord was supervising the discharge of hatches Nos. 3 and 4. These, the Inca being a well-decked steamer, are aft of the midship house, which is about 64 feet long. When the vessel was discharging these hatches, Hord ordinarily stood on the after end of the bridge deck. From this position he would not have a view of what might transpire at the port side of No. 2 hatch. But, on the stand in this court, he declared that subsequent to the fire and prior to the explosion, he went forward to observe the booms at No. 2 hatch, where they were being used to shift cargo along the dock. Immediately prior to the explosion, he says he was under the bridge on the boat deck on the starboard side, and that he had a clear and unobstructed view of Wah Wah's approach along the deck to where the powder was piled, and that he witnessed the striking of the match, and its fall to the deck. Paulsen, the third mate, says that, shortly before the disaster, he was drying some clothes near the bow of the No. 1 lifeboat on the starboard side of the bridge deck, and that Hord came forward to speak to him. While they were talking, the explosion occurred. As the roar was heard, Hord started to run aft. He then fell, or jumped into the water, breaking his arm. If the talk with Paulsen took place immediately at the bow of the lifeboat, it would have been impossible for Hord to have seen the lower deck to the port of No. 2 hatch. Hord, however, says that he was further forward near the rail on the bridge deck, and that, as he saw the match struck and thrown to the deck, he heard the roar and started to run aft, calling to Paulsen, "There goes that powder." [1,2] At the trial in the state court, Hord said that at the time of the explosion, he was standing "up forward on the boat deck, * * * underneath the bridge on the starboard side." From this position it would have been possible for him to see a portion of .

the deck to the port of No. 2 hatch, and, if he was close to the rail on the boat deck, the entire hatch was within range of his vision. Considerable stress is laid upon the alleged discrepancies in Hord's testimony, but I see no reason to disbelieve it. The man was before me, and created a rather favorable impression. Besides, human experience is that, when a startling event transports a person from a commonplace situation to one of unusual occurrence, the magnitude and importance of the latter obscures and sometimes blots out an accurate recollection of the former. I dare say that there are few of us who, after having been in the presence of horror and fright, have not had difficulty in recalling, with entire accuracy, the events that immediately preceded that experience. If the recollection of Hord be faulty in the respects suggested by petitioner, my inclination is to attribute the faults to some such trick of the mind. When all is said, the fact remains that Hord testified, both here and in the state court, that he saw loose powder from one of the boxes, and that he saw Wah Wah light the match and toss it away. The matter is one of immediate cause and effect, and is altogether reasonable. There must have been loose powder on the deck; otherwise, a match, or spark from any other cause, could not have set off explosives packed in cans inclosed in wooden cases. The fact that the powder was known to be scattered on deck, or on the boxes, and was allowed to remain, was an act of negligence. Cargo was being discharged in the immediate vicinity, and, considering the possibility of a friction spark being created from the contact of cargo with the iron deck, or the carelessness of a workman, the presence of the powder was a constant menace to every one on board. Upon the testimony, I am forced to find that the explosion took place in the manner described by Hord.

But, even if Wah Wah's connection therewith were out of the case, the difficulty of the petitioner in escaping liability would be very great. The proof that the captain was aware of the loose powder stands uncontradicted. This, with what has already been said, is enough to inflict liability upon the vessel. Had there been no powder on the deck, it is probable that the protection sought to be secured by covering the cans with a tarpaulin would have been sufficient for the occasion. But, if the testimony of Hord is to be believed, the disaster was all but invited. Undeniably, there are some differences in detail in the evidence, but I do not think them sufficient to discredit the essential facts to which Hord has testified. It is unfortunate of course, that the captain is dead, and that his testimony is therefore not to be had. But there is no reason why Hord's version of what took place, unless wholly incredible, should be disregarded.

[3] As for contributory negligence on the part of Beer, it is to be noticed that there is no evidence that he was advised that powder had leaked from one of the cases, nor that he saw it, or could readily have done so. I find, therefore, that his contribution to the accident is not established.

[4] Claimant bases his right to recover on section 33 of the Merchant Marine Act of June 5, 1920 (41 Stat. 1007 [Comp. St. § 8337a]) which provides that, in case of the death of any seaman as a result of any personal injury received in the course of his employment, the personal representative of such seaman may maintain an action therefor. That this legislation is applicable to the occurrences on board the Inca seems to be beyond serious controversy. See Wenzler v. Robin Line S. S. Co. (D. C.) 277 F. 812, and Bennett v. Connelly, 122 Misc. Rep. 149, 202 N. Y. S. 568. But the petitioner further argues that Beer's death, having actually occurred in the hospital at San Pedro de Macoris, his representative is not entitled to recover; the reason being that, at the time of his demise, Beer was not within the jurisdiction of the admiralty. In support of this, attention is called to the case of Winnefredian. Pickles v. F. Leyland & Co., Limited (D. C.) 10 F.(2d) 371, 1926 A. M. C. 231. The facts there are different than in the present case— that is, the ship was under the British flag— but, even if the ruling of the court be regarded as applying to this case, my preference is to reach the conclusion to which Judge Wolverton came in F. J. Luckenbach (Campbell v. Luckenbach S. S. Co. [D. C.] 5 F.[2d] 674, 1925 A. M. C. 884), where he said: "The coincidence that the seaman died on land does not affect the right of relief accorded to his personal representatives." That which caused the death of Beer was maritime in its nature, and it is of no consequence, so far as this proceeding is concerned, that, in an effort to alleviate his suffering, he was removed to a hospital, and that his death there occurred.

[5] The amount of damages to which claimant is entitled remains for consideration. At the time of death, Beer was 32 years of age, and had been going to sea for 14 years. He held a master's license for ocean-going vessels, but had never sailed a ship under his own command. His salary was $132 per month, but he sometimes made from $40 to $50 per week. His remittance to his wife for

the support of herself and 5 year old child was in the neighborhood of $35 per week. Under the mortality tables, Beer had an expectancy of about 34 years. With these facts upon the record, there can be little doubt that the award to be made to claimant should not be less than $25,000. It will be fixed at that sum.